Filed 5/15/23

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RREEF AMERICA REIT II CORP, YYYY,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>SAMSARA INC.,<br><br>  Defendant and Appellant. | A163827<br><br>(San Francisco County<br>Super. Ct. No. CUD21668144) |

Defendant Samsara Inc. (Samsara) appeals from a prejudgment right to attach order and order for issuance of writ of attachment in favor of plaintiff Rreef America Reit II Corp, YYYY (Rreef) in Rreef's unlawful detainer action against Samsara. The writ secures $1,969,477.56 for daily rent and charges and attorneys' fees and costs.

On appeal, Samsara asserts several challenges to the attachment order. First, Samsara argues that Rreef did not satisfy the requirement under Code of Civil Procedure section 484.090[1] that the amount to be secured is greater than zero, because the amount that Rreef sought to attach must be reduced under subdivision (b)(4) of section 483.015 by the amount remaining on the letter of credit serving as collateral for Samsara's performance of its

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exceptions of parts II. *C* & II. *D*.

[1] Undesignated statutory references are to the Code of Civil Procedure.

obligations under the parties' lease agreement, and the amount remaining on the letter of credit is greater than the amount Rreef sought to attach. Second, Samsara argues that the trial court erroneously refused to consider Samsara's affirmative defenses of waiver, estoppel, and retaliatory eviction, which are relevant to the requirement in subdivision (a) of section 484.090 that Rreef establish the "probably validity" of its claim. (§ 484.090, subd. (a)(2).) Third, Samsara argues that there is insufficient evidence to support findings that those defenses did not bar Rreef's unlawful detainer action. Finally, Samsara argues that the trial court erroneously declined to consider whether Rreef sought attachment for an improper purpose.

We conclude that Rreef's interest in the letter of credit does not fall within the scope of section 483.015, subdivision (b)(4), and thus Samsara has not shown that the amount to be secured by the attachment is not greater than zero. We further conclude that the trial court implicitly found that Samsara's waiver and estoppel defenses did not bar Rreef from proceeding with its unlawful detainer action, and that substantial evidence supports those findings. However, the record shows that the trial court declined to consider Samsara's retaliatory eviction defense and the issue of whether Rreef sought attachment for an improper purpose, believing it should not be expected to determine whether Rreef was acting in "good faith" at that stage of the proceedings. Therefore, the order is reversed and the matter is remanded to the trial court for further proceedings.

## I. BACKGROUND

### A. The Parties' Lease Agreement and the Letter of Credit

In March 2019, Samsara entered a lease agreement with Rreef to rent office space in San Francisco. The lease provided for a ten-year term, commencing on "the date on which Landlord tenders possession . . . in a

2

condition sufficient to allow Tenant to commence performing the Initial Alterations . . . ." Samsara agreed to pay rent in monthly installments beginning at $843,341.67 and increasing annually. The lease further provided that if Rreef did not deliver the premises in "delivery condition" on or before November 1, 2019, Samsara had the option of terminating the lease by providing written notice to Rreef. Samsara would also be entitled to a rent abatement of $56,222.78 per day until the delivery date occurred.

The lease required Samsara to provide Rreef with a letter of credit in the amount of $11,384,368.00. The letter of credit was to serve as "collateral for the full performance by Tenant of all of its obligations under this Lease and for all losses and damages Landlord may suffer as a result of Tenant's failure to comply with one or more provisions of this Lease." Samsara's bank issued the letter of credit the following month.

### B. Samsara's Environmental Action Against Rreef

Over two years later, in September 2021, Samsara filed a complaint against Rreef asserting claims for violation of Health and Safety Code section 25359.7, subdivision (a); breach of contract; declaratory relief; and violation of Business and Professions Code section 17200 et seq. (the environmental action). Samsara alleged that in July 2019, after Rreef had certified that the premises were in "delivery condition," Samsara discovered that the premises were contaminated with lead and asbestos. Testing allegedly showed that most of the paint was lead-based paint containing lead in amounts 24 times the EPA limit, and lead wipe samples demonstrated concentrations up to 35 times the legal limit. The premises also allegedly contained at least 80,000 square feet of asbestos-containing flooring and roofing material. The complaint further alleged that after Samsara conducted the testing, Rreef accused Samsara of breaching the lease and cut off its access to the premises,

3

displacing Samsara from the premises for months. Rreef eventually hired its own environmental contractor, but it shared limited information with Samsara regarding its testing of the premises, and it allegedly failed to test for the presence of lead.

According to the complaint, in January 2021, Samsara engaged an environmental consultant, who discovered that the premises were still not in delivery condition, as Rreef had failed to fully abate the lead contamination. Rreef again attempted to abate the lead but was unsuccessful, and it failed to recertify that the premises were in delivery condition. Samsara exercised its right to terminate the lease in March 2021, and it initiated the environmental action six months later. Samsara asserted that it was entitled to a rent abatement under the lease agreement in the amount of $56,222.78 per day for each day after July 15, 2019, given Rreef's failure to timely deliver the premises.

## C. The Unlawful Detainer Action

The day after Samsara initiated its environmental action, Rreef served it with a 5-day notice to pay rent or quit based on Samsara's alleged failure to pay rent for the months of August 2021 and September 2021, in the total amount of $1,826,697.95. Approximately two weeks later, Rreef filed an unlawful detainer complaint, alleging that Samsara failed to pay the amount due as stated in the 5-day notice. The complaint alleged that Samsara stopped paying rent in May 2021, and had created a pretext to avoid its lease obligations because the report of the environmental consultant Samsara had hired in early 2021 showed that despite de minimis contamination of lead, the premises were safe to use under applicable standards, and Samsara continued to use the premises. The complaint sought possession of the premises, recovery of all unpaid rent for the months of August and September

4

2021, and damages for each day Samsara continued in possession from October 1, 2021 through the date of judgment.

In its verified answer, Samsara asserted several affirmative defenses, including retaliatory eviction, equitable estoppel, and waiver.

### D. Rreef's Attachment Application

In October 2021, Rreef filed an application for right to attach order and order for issuance of a writ of attachment in the unlawful detainer action. In its application, Rreef argued that it had met the statutory requirements for a right to attach order. First, it contended that its claim was one upon which an attachment may be issued because its unlawful detainer claim was an unsecured, commercial claim for money due under a contract for a readily ascertainable amount. Second, it had established the probable validity of its claim because Samsara failed to pay rent as required under the parties' lease agreement, Rreef had served a 5-day notice on Samsara, Samsara failed to cure or quit within five days after receiving the notice, and Samsara had no viable defenses. Third, Rreef was seeking attachment for a proper purpose because it sought attachment for no purpose other than to recover rent and charges due and owing under the lease. Finally, Rreef asserted that the amount to be attached should be $3,796,175.51, consisting of the amount demanded in the 5-day notice ($1,826,697.5) and $1,784,477.53 for the reasonable rental value per day from October 1 through November 30.

Samsara made several arguments in opposition. As relevant to this appeal, Samsara first argued that Rreef failed to establish the probable validity of its claim because its claim was barred by waiver, estoppel, and retaliatory eviction defenses. Samsara contended that Rreef waived its right to continue with its unlawful detainer action when it accepted Samsara's payment under protest of the full amount of the rent demanded in the 5-day

5

notice after it had initiated the unlawful detainer action. Samsara further contended that Rreef's unlawful detainer claim was barred as a matter of law under the estoppel doctrine because prior to accepting Samsara's payment under protest, Rreef had explicitly represented in opposition to Samsara's *ex parte* application to consolidate the parties' actions that Samsara's payment of rent would resolve the unlawful detainer action.

Regarding Samsara's retaliatory eviction defense, Samsara asserted that Rreef's main purpose in bringing its unlawful detainer action was to "drive up costs and pressure Samsara in retaliation for Samsara's filing of the environmental action," and therefore Rreef was precluded in proceeding with its action. Samsara further argued that Rreef could not satisfy subdivision (a)(4) of section 484.090, which requires that " '[t]he attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.' " Finally, Samsara argued that Rreef was not entitled to attachment because its claim was fully secured by the letter of credit.

In reply, Rreef disputed Samsara's argument that Rreef was "fully secured" by the letter of credit. Rreef further asserted that it had no obligation to draw on the letter of credit where Samsara had committed an " 'incurable event of default' " under the lease. Finally, Rreef asserted that it sought attachment for a proper purpose because Samsara failed to pay rent while continuing to occupy the premises.

A few months later, after hearing argument on Rreef's attachment application, the court granted Rreef's application.

This appeal followed.

6

## II. DISCUSSION

### A. Basis for Right to Attach Order and Standard of Review

" ' "Attachment is an ancillary or provisional remedy to aid in the collection of a money demand by seizure of property in advance of trial and judgment." ' " (*Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1476, italics omitted.) "[T]he amount to be secured by an attachment" is "[t]he amount of the defendant's indebtedness claimed by the plaintiff" (§ 483.015, subd. (a)) plus allowable costs and attorney fees (§§ 483.015, subd. (a), 482.110). Before an attachment order is issued, the court must find all of the following: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the applicant has established "the probable validity" of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than the recovery upon which the request for attachment is based; and (4) the amount to be secured by the attachment is greater than zero. (§ 484.090, subd. (a).) The plaintiff has the burden of establishing the probable validity of the claim upon which the attachment is based. (*Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 852.)

"On appeal from an attachment order, we review the record for substantial evidence to support the trial court's factual findings." (*Goldstein v. Barak Construction, supra*, 164 Cal.App.4th at p. 853.) "We will not disturb a determination upon controverted facts unless no substantial evidence supports the court's determination." (*Ibid.*) However, where there are no contested issues of fact, the issue becomes one of law subject to de novo review. (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 163.)

### B. The Amount to Be Secured Is Greater Than Zero.

As mentioned, one of the requirements for the issuance of an attachment order is that the amount to be secured by the attachment is greater than zero. (§ 484.090, subd. (a)(4).) And under subdivision (b)(4) of section 483.015, the amount an applicant seeks to secure by attachment "shall be reduced by . . . [¶] [t]he value of any security interest in the property of the defendant held by the plaintiff to secure the defendant's indebtedness claimed by the plaintiff, together with the amount by which the value of the security interest has decreased due to the act of the plaintiff or a prior holder of the security interest." (§ 483.015, subd. (b)(4).)

Samsara argues that the amount to be secured by attachment—$1,969,477.56—should be reduced by the amount remaining on the letter of credit under section 483.015, subdivision (b)(4), and that because the letter of credit has more than $8 million remaining, Rreef cannot show that the amount to be secured by attachment is greater than zero. We review this issue de novo because it requires us to interpret subdivision (b)(4) of section 483.015.[2] (*SwiftAir, LLC v. Southwest Airlines Co.* (2022) 77 Cal.App.5th 46, 52.)

---

[2] At oral argument, Rreef contended that Samsara waived the issue whether subdivision (b)(4) of section 483.015 applies to preclude attachment in this case by failing to raise it in the trial court. Even assuming Samsara did not raise this issue in the trial court, "[p]arties have been permitted to raise new issues on appeal where the issue is purely a question of law on undisputed facts." (*Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1709.) There is no dispute here that the amount remaining on the letter of credit is more than the amount to be secured by attachment, and that the letter of credit served as collateral for Samsara's performance under the parties' lease agreement. Moreover, Rreef has argued the issue on the merits in its response brief and does not claim that there was additional evidence it would have introduced in the trial court if the issue had been presented

8

### 1. *The Requirements for Applying Subdivision (b)(4) of Section 483.015*

Under section 483.015, subdivision (b)(4), the amount to be secured by attachment can only be reduced by the value of the plaintiff's "security interest" in "the property of the defendant . . . ." (§ 483.015, subd. (b)(4).) "Security interest" as that phrase is used in subdivision (b)(4) of section 483.015 "means 'security interest' as defined in Section 1201 of the Commercial Code." (§ 481.223.) Commercial Code section 1201, subdivision (b)(35) provides: " 'Security interest' means an interest in personal property or fixtures that secures payment or performance of an obligation." The property subject to a security interest is the "collateral." (Cal. U. Com. Code, § 9102, subd. (a)(12).)

Division 9 of the Commercial Code governs transactions that create by contract the type of security interest at issue under subdivision (b)(4) of section 483.015, i.e., a security interest in personal property or fixtures. (Cal. U. Com. Code, § 9109, subd. (a)(1).) Under that division, if the creditor has a valid security interest in the collateral, then on default by the debtor, the creditor has several rights and remedies, including taking possession of the collateral or selling the collateral. (Cal. U. Com. Code §§ 9601, subd. (a), 9610, subd. (a).)

While Samsara argues that Rreef's interest in the letter of credit is a security interest within the meaning of subdivision (b)(4) of section 483.015 because the parties agreed that the letter of credit would be used as collateral

---

there. Therefore, because the application of subdivision (b)(4) of section 483.015 concerns a matter of statutory interpretation, we will exercise our discretion to consider the merits of Samsara's argument.

for Samsara's performance under the agreement, Samsara does not address in its opening brief whether Rreef's interest in the letter of credit is a security interest "in the property of the defendant . . . ."  (§ 483.015, subd. (b)(4).) Rreef contends that its interest in the letter of credit is not a security interest in the property of Samsara, as it is the issuer of the letter of credit—in this case, Samsara's bank—that is obligated to make payment to a beneficiary of a letter of credit—in this case, Rreef.  Samsara disagrees, arguing in its reply that the letter of credit "necessarily includes an obligation" on the part of Samsara to reimburse its bank for any amounts the bank paid out to Rreef under the letter of credit.  Given the express language in subdivision (b)(4) of section 483.015 that the security interest held by the plaintiff be in "the property of the defendant," we consider whether a beneficiary's interest in a letter of credit constitutes a security interest in the property of the party who purchased the letter of credit.

### 2. *Letters of Credit as Collateral for the Debtor's Performance*

Letters of credit are governed by division five of the Commercial Code. Commercial Code section 5102, subdivision (a)(10) defines a letter of credit as "a definite undertaking . . . by an issuer to a beneficiary at the request or for the account of an applicant . . . to honor a documentary presentation by payment or delivery of an item of value."  (Cal. U. Com. Code, § 5102, subd. (a)(10).)  There are essentially three relationships that exist in a letter of credit transaction: that of the bank to its customer who purchases the letter of credit; that of the bank to the beneficiary to whom it makes a promise to pay; and that between the customer and the beneficiary.  (*San Diego Gas & Electric Co. v. Bank Leumi* (1996) 42 Cal.App.4th 928, 933.)

Commercial Code section 5108, subdivision (a) provides that "[a]n issuer shall honor a presentation that . . . appears on its face to strictly comply with

the terms and conditions of the letter of credit." (Cal. U. Com. Code, § 5108, subd. (a).) " 'Presentation' " is defined as "delivery of a document to an issuer or nominated person for honor or giving of value under a letter of credit." (Cal. U. Com. Code, § 5102, subd. (a)(12).) Those statutes " 'reflect[] the concept that the letter of credit is independent from the underlying [] contract.' " (*San Diego Gas & Electric Co. v. Bank Leumi, supra*, 42 Cal.App.4th at p. 934.) "This unique feature, referred to as the 'independence principle,' is the primary characteristic of a letter of credit. Absent fraud, the issuer must pay upon proper presentment regardless of any defenses the applicant for the letter of credit may have against the beneficiary arising from the underlying transaction." (*Ibid.*)

The parties do not present any case law, nor have we found any, establishing that a beneficiary's interest in a letter of credit constitutes a security interest under the Commercial Code, and if it is a security interest, that it is a security interest in the customer's property. Samsara cites *Western Security Bank, N.A. v. Superior Court* (1997) 15 Cal.4th 232 (*Western Security*) as support for its argument that the letter of credit serves as security for its obligations under the lease. Our Supreme Court in *Western Security* expressly declined to determine whether a letter of credit constituted a "security interest" within the meaning of division 9 of the Commercial Code. (*Id.* at p. 251.) Nevertheless, *Western Security* is instructive because it found that a letter of credit is "a form of security for assuring another's performance" (*ibid.*), and it indicates that the issuer's obligation to pay the beneficiary—and not the customer's property—serves as security where, as here, the customer and the beneficiary intended the letter of credit to act as collateral. That the customer's property does not serve as security in such a situation is dispositive of the question whether Rreef has a security interest

11

in the property of Samsara.  (§§ 481.223, 483.015, subd. (b)(4); Cal. U. Com. Code, § 1201, subd. (b)(35) [a security interest in property "secures" payment or performance].)

In *Western Security*, the court was considering whether an amendment to the anti-deficiency statute applied retroactively to the case before it. (*Western Security, supra*, 15 Cal.4th at p. 237.)  The anti-deficiency statute precludes a judgment for any loan balance left unpaid after a lender has nonjudicially foreclosed on real property that was security for loan obligations.  (*Ibid*.)  But the pursuit of additional security is not a deficiency judgment.  (*Freedland v. Greco* (1955) 45 Cal.2d 462, 465).  The amendment at issue in *Western Security* provided in part that a lender's resort to a letter of credit did not constitute a failure to proceed first against security. (*Western Security*, at p. 247.)  The Court of Appeal concluded that the amendment amounted to a change in the law with only prospective application because it found that a letter of credit was like a guaranty, which does not serve as security for a debtor's obligations; rather, it is a promise to provide additional funds in the event of the debtor's future default.  (*Id*. at pp. 242, 247–248.)  In other words, the Court of Appeal concluded that the amendment was not a mere clarification of the anti-deficiency law because under prior law, a letter of credit was not a means of securing payment.  (*Id*. at pp. 247–248.)

The Supreme Court reversed the Court of Appeal, finding that a letter of credit was not a form of guaranty in part because "suretyship involves no counterpart to the independence principle essential to letters of credit." (*Western Security, supra*, 15 Cal.4th at pp. 250–251.)  The court further found that "[b]y focusing on analogies to guaranties, the Court of Appeal also overlooked that the parties in this case specifically intended the standby

letters of credit to be additional security." (*Id.* at p. 251.) The court concluded that it did not need to determine whether letters of credit came within the scope of division 9 of the Commercial Code, because it was sufficient for purposes of the anti-deficiency statutes that a letter of credit is "a form of security for assuring another's performance." (*Id.* at p. 251.) Specifically, it concluded that "[a] standby letter of credit is a security device created at the request of the customer/debtor that is an obligation owed independently by the issuing bank to the beneficiary/creditor." (*Id.* at p. 252.) "A creditor that draws on a letter of credit does no more than call on all security pledged for the debt." (*Ibid.*) As support for its conclusion, the court cited with approval the discussion in *San Diego & Electric Co. v. Bank Leumi, supra*, 42 Cal.App.4th at pp. 933-934 regarding the independence principle that is essential to letters of credit. (*Western Security*, at p. 252.) The court therefore held that the amendment applied retroactively as a "clarification" of the anti-deficiency law: "When viewed as additional security for a note also secured by real property, a standby letter of credit does not conflict with the statutory prohibition of deficiency judgments." (*Id.* at pp. 251–252.)

Extrapolating from the court's reasoning in *Western Security*, we conclude that because the parties agreed to use a letter of credit as collateral for Samsara's performance under the parties' lease agreement, Samsara's performance is secured by its bank's obligation to pay on the letter of credit, and not by Samsara's property. The issuer's independent obligation to pay the beneficiary under a letter of credit is the basis for our Supreme Court's conclusions that a letter of credit "is a form of security for assuring another's performance," and that a beneficiary that draws on a letter of credit is calling "on *all* security pledged for the debt." (*Western Security, supra*, 15 Cal.4th at pp. 251–252, italics added.) Stated differently, where a letter of credit is used

13

as collateral, it is the issuer's property that guarantees payment under the parties' agreement. (Black's Law Dict. (11th ed. 2019) p. 1626, col. 1 [defining "security" as "[c]ollateral given or pledged to guarantee the fulfillment of an obligation"]; *San Diego Gas & Electric Co. v. Bank Leumi, supra*, 42 Cal.App.4th at p. 934 [" '[O]ne of the expected advantages and essential purposes of a letter of credit is that the beneficiary will be able to rely on assured, prompt payment from a solvent party . . . .' "].) Ordinarily, the customer's property is not involved until after the issuer has paid the beneficiary, and only if the issuer seeks reimbursement from the customer for any payments the issuer made to the beneficiary. (*Western Security*, *supra,* at pp. 237, 251, fn. 8 ["Even though the standby letter of credit is functionally equivalent to a cash deposit, it differs from a cash deposit because the customer does not have to part with its own funds until payment is made and it is forced to reimburse the issuing bank"].)

Although courts have not addressed the precise issue of whether the beneficiary's interest in a letter of credit constitutes a security interest in the customer's property, the case law supports our conclusion that where a letter of credit serves as collateral for the customer's performance of obligations owed to the beneficiary, it is the issuer's property securing that performance. (See *San Diego Gas & Electric Co. v. Bank Leumi, supra*, 42 Cal.App.4th at p. 934.) In *Crocker Nat. Bank v. Superior Court* (1977) 68 Cal.App.3d 863, the Second District reversed an order granting injunctions prohibiting a national banking association that had issued a letter of credit from disbursing funds to the beneficiary under the terms and provisions of the letter of credit, because a federal statute prohibited injunctions against a national banking association or its property. (*Id.* at pp. 865, 868–869, 872.) The court rejected the plaintiff's argument that the letter of credit did not involve the bank's

14

property, finding instead that the issuer's "primary liability under the letter of credit [to the beneficiary] can only mean that [the bank's] property was involved." (*Id.* at pp. 870, 872.) Federal courts have similarly concluded in the bankruptcy context that a payment made by the issuer to a beneficiary pursuant to a letter of credit constitutes a transfer of the issuer's property, and not a transfer of the debtor's interest in property, and thus a bankruptcy trustee cannot challenge such transfers on behalf of the debtor. (See, e.g., *Kupetz v. Continental Illinois Nat. Bank and Trust Co. of Chicago* (1987) 77 B.R. 754, 765 [finding that any payment of funds pursuant to a letter of credit "could only be classified as a transfer of [the issuer's] property to the beneficiary of the letter of credit"]; *Berman v. Le Beau Inter-America, Inc.* (1981) 509 F. Supp.156, 160–161 [same].) Those decisions exemplify that the issuer's property directly secures the customer's performance when a letter of credit is used as collateral in an agreement between the customer and the beneficiary.

Samsara argues that the customer's property is "at issue" in a letter of credit transaction because a "request made by a beneficiary to a bank that is holding" the customer's property is a "trigger for obtaining" the customer's property. But under section 483.015, subdivision (b)(4), the question is whether *Rreef* holds a security interest in Samsara's property. We think not. Any obligation the customer may have to reimburse the issuer for payments the issuer made to the beneficiary under a letter of credit is separate from the issuer's obligation to pay the beneficiary. " ' "If … the customer goes into bankruptcy after the letter has been issued, but before it has been drawn upon, the issuer must pay despite the fact that the customer will not be able to pay the issuer. The same would be true if the customer had repudiated the contract of reimbursement." ' " (*California Bank & Trust v. Piedmont*

15

*Operating Partnership, L.P.* (2013) 218 Cal.App.4th 1322, 1335; see *Western Security, supra*, 15 Cal.4th at p. 251, fn. 8.) It ultimately falls on the issuer to seek reimbursement from the customer.[3] Nothing in the statutory scheme governing letters of credit provides the *beneficiary* of a letter of credit any rights or remedies with respect to the customer's property similar to the rights and remedies a secured party has under division 9 of the Commercial Code, and thus this is not a situation where the debtor's property serves as collateral for obligations it owes to the creditor. We therefore cannot conclude that Reef, as the beneficiary of the letter of credit, holds a security interest in the property of Samsara.[4]

---

[3] And in most cases, the customer's obligation to reimburse an issuer is more in the nature of an unsecured guaranty in that it represents the customer's promise to make payment in the future, although an issuer may require the customer to provide collateral to secure the performance of obligations the customer owes the issuer. (*Western Security, supra*, 15 Cal.4th at p. 261 & fn. 5 (conc. opn. of Mosk, J.) ["Although it appears to be uncommon, an issuer of a standby letter of credit may demand security from its customer in the form of cash collateral or personal property as a condition for issuing the letter of credit"].)

[4] Samsara argues in its reply brief that several cases recognize that the customer's property is "at issue." However, those cases do not stand for the proposition that the customer's property secures performance of obligations it owes the beneficiary where a letter of credit is used as collateral. Rather, they acknowledge that the issuer's obligation to pay the beneficiary under a letter of credit is independent of the contractual relationship between the beneficiary and the customer and the customer's obligation to reimburse the issuer. (See *San Diego Gas & Electric Co. v. Bank Leumi, supra,* 42 Cal.App.4th at pp. 935–936; *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.* (2d Cir. 1983) 707 F.2d 680, 682–683; *Ross Bicycles, Inc. v. Citibank, N.A.* (N.Y. Sup. Ct. 1994) 161 Misc. 2d 351, 355; *New York Life Ins. Co. v. Hartford Nat'l Bank & Tr. Co.* (1977) 173 Conn. 492, 501–502; *Dynamics Corp. of America v. Citizens & Southern Nat. Bank* (1973) 356 F. Supp. 991, 995–996; *First Ave. West Bldg., L.L.C. v. James* (*In re Onecast Media, Inc.)* (2006) 439 F.3d 558, 564.)

In reaching this conclusion, we need not and do not decide whether a beneficiary's interest in a letter of credit constitutes a "security interest" within the meaning of division 9 of the Commercial Code. We hold only that Reef's interest in the letter of credit is not a security interest in the property of Samsara, and thus subdivision (b)(4) of section 483.015 does not apply to reduce the amount to be secured by attachment. (§ 483.015, subd. (b)(4).) Therefore, Samsara has not shown that the trial court erred in concluding that the amount to be secured by attachment is greater than zero.[5]

## C. *Samsara's Waiver and Estoppel Defenses*

Regarding its waiver and estoppel defenses, Samsara makes three arguments in support of its contention that the trial court erred in granting Rreef's attachment application. First, Samsara argues that the trial court was required to consider those defenses when it was determining the probable validity of Rreef's unlawful detainer claim but refused to do so. Second, Samsara argues that the undisputed evidence shows that Rreef waived its right to assert a forfeiture of the lease, and therefore Rreef's unlawful detainer claim is not valid. Third, Samsara contends that the undisputed evidence shows that Rreef is estopped from proceeding with its unlawful detainer action. We are not persuaded.[6]

---

[5] The parties also dispute whether the letter of credit falls within the scope of section 483.020, subdivision (e), which provides that security deposits cannot be subtracted from the amount to be secured by attachment. (§ 483.020, subd. (e).) We need not decide this issue because even if the letter of credit is not a security deposit within the meaning of section 483.020, subdivision (e), it would not change the outcome of the issue of whether the amount to be attached can be reduced by the amount remaining on the letter of credit.

[6] Samsara does not challenge the trial court's finding that Rreef made a prima facie showing of the probable validity of its claim. (*Pech v. Morgan*

17

### 1. *The Record Does Not Show that the Trial Court Failed to Consider Samsara's Waiver and Estoppel Defenses.*

Before issuing a right to attach order, the trial court must find that the plaintiff's claim has " 'probable validity,' " meaning that "it is more likely than not" that the plaintiff will obtain a judgment against the defendant on that claim. (§§ 484.090, subd. (a), 481.190.) To determine whether a party has demonstrated the probable validity of its claim under attachment law, the court must "consider the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation." (Cal. Law Revision Com. com., 15A West's Ann. Code Civ. Proc. (2011 ed.) foll. § 481.190, p. 20; *Howard S. Wright Construction Co. v. Superior Court* (2003) 106 Cal.App.4th 314, 319–320.)

In the trial court, Samsara asserted waiver and estoppel defenses as support for its position that Rreef could not establish the probable validity of its claim. Samsara argues on appeal that the trial court failed to consider those defenses based on a comment the court made at the hearing on Rreef's attachment application that those defenses were " 'neither here nor there.' " According to Samsara, the trial court erred as a matter of law in granting the application without considering the merits of those defenses.

"Under the doctrine of 'implied findings,' if the record is silent, we must presume the trial court fully discharged its duty to consider all of the relevant statutory factors and made all of the factual findings necessary to

---

(2021) 61 Cal.App.5th 841, 856 [plaintiff has the burden of making a prima facie showing of the probable validity of his or her claim under section 481.190].) Samsara argues only that the trial court failed to consider some of Samsara's affirmative defenses and that the undisputed evidence shows that those defenses apply to bar Rreef's unlawful detainer action. Our review is limited to those issues that have been adequately raised and supported in Samsara's brief. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721.)

support its decision for which there is substantial evidence." (*Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320.) However, those presumptions do not apply where the record shows that the court did not actually perform its factfinding function on the question for which we would infer findings. (*Beachcomber Management Crystal Cove, LLC v. Superior Court* (2017) 13 Cal.App.5th 1105, 1122–1123; see *Kemp Bros. Construction, Inc. v. Titan Electric Corp., supra*, 146 Cal.App.4th at p. 1477 [" 'When the record clearly demonstrates what the trial court did, we will not presume it did something different' "].)

Samsara cites *Kemp Bros. Construction, Inc. v. Titan Electric Corp., supra*, 146 Cal.App.4th 1474 as support for its argument. There, the plaintiff contractor sued its former subcontractor for breach of contract, and it sought a pretrial right to attach order. (*Id.* at p. 1476.) The trial court found that the defendant could not " 're-litigate' " the issue of its breach of contract based on a prior proceeding where a Los Angeles Unified School District determined that the plaintiff had grounds for substituting the defendant out of its subcontract. (*Id.* at pp. 1476–1477.) On appeal, the Fourth District found that the trial court erred in concluding that the defendant was collaterally estopped from litigating its alleged breach of contract. (*Id.* at p. 1477.) It further found that the minute order and the reporter's transcript demonstrated that the trial court did not engage in the process of weighing the evidence "because it improvidently agreed with [the plaintiff's] argument that [the defendant] was barred from 're-litigat[ing]' the issue of its alleged breach of contract and ruled accordingly." (*Id.* at p. 1478.) It thus reversed and remanded with directions to the trial court to consider the " 'relative merits of the positions of the respective parties and make a determination of the probable outcome.' " (*Ibid.*)

19

This case is not like *Kemp Bros Construction, Inc.* Here, the parties presented evidence in support of their respective positions on Samsara's claims of waiver and estoppel and argued those positions at the hearing, the trial court expressly found that Rreef had established the probable validity of its claim, and there is nothing in the record that shows the trial court failed to consider Samsara's waiver and estoppel defenses in coming to that conclusion. The trial court's comment that Samsara cites as support for its argument referred only to Samsara's waiver defense, and in making that comment, the trial court was simply noting that the waiver defense was not relevant to the amount of damages Rreef could seek in its unlawful detainer action, which Samsara's counsel was discussing at that time. The trial court later heard arguments on the waiver and estoppel claims from both parties, and it made no express comments indicating that it would not consider the merits of the parties' respective positions on those claims. Because the record does not show that the trial court failed to consider and weigh the evidence relevant to Samsara's waiver and estoppel defenses, we may infer findings to support the trial court's decision. (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103–1104.) We thus consider the sufficiency of the evidence supporting the trial court's implied findings regarding Samsara's waiver and estoppel defenses.

### 2. *Substantial Evidence Supports a Finding that Rreef Did Not Waive Its Unlawful Detainer Claim*

Samsara next argues that the undisputed evidence shows that Rreef waived its right to proceed with the unlawful detainer action when it accepted rent from Samsara after initiating its unlawful detainer action.

20

### a. Governing Law

"A waiver is an intentional relinquishment of a known right." (*Salton Community Services Dist. v. Southard* (1967) 256 Cal.App.2d 526, 532.) Waiver is a question of fact for the trial court. (*Black v. Arnold Best Co.* (1954) 124 Cal.App.2d 378, 384–385.) Conduct manifesting an intention to waive, such as acceptance of benefits under a lease, can support a finding of implied waiver. (*Salton Community Services Dist. v. Southard, supra,* at pp. 532–533.) The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation; doubtful cases will be decided against a waiver. (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60.)

A nonwaiver clause in the parties' lease agreement militates against a finding of waiver. In *Karbelnig v. Brothwell* (1966) 244 Cal.App.2d 333, for example, the defendants transferred their lease to third parties in violation of their lease agreement with the plaintiff. (*Id.* at pp. 334–337.) The defendant asked the plaintiff to consent to the assignment, but the plaintiff refused. (*Ibid.*) The lease contained a nonwaiver clause, which provided "that the acceptance of the rent by the lessor after knowledge of a breach of covenant shall not be deemed a waiver of such breach." (*Id.* at p. 341.) The assignee paid the rent for a year, and each month, the plaintiff sent a letter to the defendants stating that its " 'acceptance of [the] rental payment is in no way to be construed as an acceptance or waiver to an assignment or transfer of sub-leasing of the lease . . . .' " (*Id.* at p. 337.) In the plaintiff's declaratory relief action, which sought to declare the lease forfeited, the trial court found that the plaintiff's acceptance of the rent constituted a waiver of the defendants' breach of the lease. (*Id.* at p. 339.)

The appellate court reversed, holding that " 'while an intent to waive may be inferred from the acceptance of rent under certain circumstances, such an inference may be rebutted . . . by the express agreement between the parties that the rent was paid and accepted without prejudice.' " (*Karbelnig v. Brothwell, supra*, 244 Cal.App.2d at p. 341.) The court found that the plaintiff not only relied on the nonwaiver clause in the parties' agreement, but it had also given notice that its acceptance of the rent was not to be construed as a consent to the assignment of the lease or a waiver of its right to assert a forfeiture. (*Id.* at p. 342.) The court further found that the plaintiff, "upon discovery of the breach of covenant, acted promptly in filing its cause of action wherein it sought a forfeiture." (*Ibid.*) The court found no waiver under those circumstances. (*Ibid.*)

Absent a nonwaiver clause, a landlord who accepts rent "unconditionally" and "without making any complaint" with full knowledge of a preceding breach waives his or her right to assert a forfeiture based on that breach. (*Kern Sunset Oil Co. v. Good Roads Oil Co.* (1931) 214 Cal. 435, 447.) In *Kern Sunset Oil Co.*, the plaintiff sought to declare a forfeiture of a lease of oil lands that the original tenant had assigned to the defendant oil company. (*Id.* at p. 437.) The plaintiff argued that the defendant had broken the terms of the lease providing for the drilling and placing of two wells each year until sixteen wells had been drilled, as the defendant had only completed thirteen wells in thirteen years. (*Ibid.*) The trial court concluded that there was no breach of the lease, and that even if there was a breach, the plaintiff had waived the right to claim a breach. (*Id.* at p. 439.) On appeal from the judgment entered in favor of the defendant, our high court concluded that the landlord had waived any right to assert a forfeiture of the lease because it had accepted regular monthly payments of royalty from the wells for almost

five years, with full knowledge of the facts regarding the defendant's alleged breach of the lease, and "without making any complaint or objection to the default on the lessees' part." (*Id.* at pp. 440, 443–444.) Accordingly, it affirmed the judgment in favor of the defendant. (*Id.* at p. 447.)

But a landlord's acceptance of rent with knowledge of a preceding breach does not always constitute a waiver of the right to assert a forfeiture based on that breach; waiver is ultimately a matter of intent. In *Thriftimart, Inc. v. Me & Tex* (1981) 123 Cal.App.3d 751, for example, the plaintiff's predecessor had leased to the defendants a parcel of land in a shopping center. (*Id.* at p. 753.) After the defendants' assignee began construction work on the leased land and in an area beyond the leased premises in 1973, the plaintiff demanded that the work be removed. (*Ibid.*) The parties thereafter attempted to negotiate, but after they failed to reach a settlement, the plaintiff initiated an unlawful detainer action in 1978. (*Ibid.*) On appeal from a judgment in favor of the plaintiff, the defendants argued that because the plaintiff accepted rent from 1973 until 1978, the plaintiff had waived its right to assert a forfeiture. (*Ibid.*) The appellate court disagreed, finding that the "plaintiff, from the start of the construction, clearly evidenced its objection to it." (*Id.* at p. 754.) It further found that the plaintiffs' negotiations with the defendant evidenced "not a willingness to waive --which would have kept the original lease in force at the contractual rent-- but a willingness to lease the land encroached upon and, if that extended lease were arrived at, to continue the lease on the original parcel. We cannot impose on plaintiff a penalty for a reasonable effort to achieve an amicable adjustment of the breach." (*Ibid.*) The court thus affirmed the judgment in favor of the plaintiff. (*Ibid.*)

23

### b. Factual Background

In this case, the evidence presented by the parties show that Samsara ceased paying the monthly rent required by the parties' lease agreement in May 2021, and Rreef immediately served Samsara with a notice of default, which Samsara did not cure. After the parties were unable to resolve the rent dispute, Rreef drew on the letter of credit in August 2021 to cover the delinquent rent. Rreef then demanded that Samsara replenish the letter of credit, as required by their lease agreement. When Samsara failed to do so and again failed to pay rent in September 2021, Rreef sent the 5-day notice on September 10, 2021 demanding payment of rent for August and September, and then filed this action a couple of weeks later. Samsara wired payment for the August and September rent to Rreef after Rreef filed the attachment application. The next morning, Rreef's counsel stated in an email to Samsara's counsel that Samsara's payment of the August and September rent "does not resolve the issue of Tenant's unlawful possession of the Premises[,]" and that the unlawful detainer action was not "moot" because Samsara continued to remain in possession despite not paying October rent.[7]

---

[7] Rreef's main argument in opposition to Samsara's waiver defense is that because Samsara had failed to pay the rent for October by the time it paid the August and September rent, its payment constituted a "partial" payment within the meaning of section 1161.1, subdivision (c). That subdivision provides that a commercial landlord's acceptance of a "partial payment" of rent after filing an unlawful detainer action does not waive its right to assert forfeiture. However, the phrase "partial payment" as used in section 1161.1 appears to refer to a sum less than the amount demanded in the 5-day notice, as subdivision (b) of section 1161.1 states that a landlord that accepts a partial payment of rent "may commence and pursue an action . . . to recover the difference between the *amount demanded in that notice* and the payment actually received . . . ." (§ 1161.1, subd. (b), italics added.) Nevertheless, we need not decide this issue because, as discussed below, we conclude that substantial evidence supports the trial court's implicit finding

There is no indication in the record that Samsara responded to this email or requested that Rreef return the payment.

Section 19.2 of the parties' lease agreement provides that Rreef's acceptance of rent "shall not be deemed to be a waiver of any preceding breach" of the lease by Samsara "other than the failure of [Samsara] to pay the particular rent so accepted . . . ." It further states that "[n]o waiver by Landlord of any breach hereof shall be effective unless such waiver is in writing and signed by Landlord."

### c. Application of Waiver Law to this Case

After hearing argument on Samsara's waiver defense and reviewing the parties' evidence, the trial court granted Rreef's attachment application, implicitly finding no waiver on Rreef's part. On appeal, our role is limited to determining whether, based on the entire record, there was any substantial evidence to support that finding. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660; *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 ["The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record"].) There was.

The parties' lease agreement requires Rreef to put its intention to waive its right to assert a forfeiture in writing to effectuate a waiver of "any" breach of the lease, but there is no evidence that it did so with respect to Samsara's nonpayment of rent.[8] Such clauses are enforceable (*Hersch v. Citizens*

---

that Rreef did not waive its right to assert forfeiture when it failed to return or reject Samsara's wire payment.

[8] Rreef focuses on the first clause of the first sentence of the nonwaiver provision, but it is of no help to Rreef. The full first sentence of the nonwaiver provision provides that Rreef's acceptance of rent "shall not be deemed to be a waiver of any preceding breach" of the lease by Samsara

*Savings & Loan Assn.* (1983) 146 Cal.App.3d 1002, 1009–1010), and the clause here supports a reasonable inference that Rreef did not intend to waive any right to assert a forfeiture based on Samsara's nonpayment of rent. (See *Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176, 1180 ["[A]n antiwaiver provision would militate against a finding of waiver under most circumstances"].)

Moreover, although a "waiver clause may be waived by conduct" (*Bettelheim v. Hagstrom Food Stores, Inc.* (1952) 113 Cal.App.2d 873, 878), Rreef's conduct supports a finding that it did not intend to relinquish its right to assert a forfeiture. As in *Thriftimart, Inc. v. Me & Tex, supra,* 123 Cal.App.3d 751, the record here clearly evidences Rreef's objection to Samsara's nonpayment of rent "from the start." (*Id.* at p. 754.) Rreef acted promptly in notifying Samsara of its initial default and in initiating this action after Samsara failed to pay rent the next few months. And when Samsara wired payment of the rent demanded in the 5-day notice, Rreef immediately notified Samsara that it would not dismiss its unlawful detainer action. Thus, unlike the landlord in *Kern Sunset Oil Co. v. Good Roads Oil Co., supra,* 214 Cal. 435, Rreef did not accept rent "without making any complaint or objection" about Samsara's alleged default. (*Id.* at pp. 443–444.) Based on those circumstances, the trial court reasonably could have concluded that Rreef did not intend to waive its right to assert a forfeiture despite failing to return or reject Samsara's wire payment.

The cases relied on by Samsara are distinguishable. In *EDC Associates Ltd. v. Gutierrez* (1984) 153 Cal.App.3d 167, the Fifth District found that the

---

"*other than* the failure of [Samsara] to pay the particular rent so accepted . . . ." (Italics added.)

only evidence presented at trial on the issue of waiver showed that the tenant had mailed money orders for delinquent rent and for the next month's rent, and the landlord did not refuse tender or return the money orders. (*Id.* at p. 171.) Because there was no evidence "that [the landlord] took other action to insure that there was no waiver[,]" the court found that under the circumstances, the landlord had waived its right to assert a forfeiture for failure to pay the rent on the date due. (*Ibid.*) In *Miller v. Reidy* (1927) 85 Cal.App. 757, the landlord similarly accepted rent from the tenant for two years after learning of the tenant's breach, with only the statement, " 'without prejudice to any of my rights under the lease of said premises.' " (*Id.* at p. 762.) Here, in comparison, Rreef specifically objected to Samsara's nonpayment of rent, and it did not accept Samsara's payment of rent until after it had already initiated the unlawful detainer action, and it did so only upon informing Samsara that it was unwilling to dismiss the unlawful detainer action.[9] In sum, this is not a case where there is insufficient evidence to support a finding that the landlord did not intend to relinquish its right to assert a forfeiture of the lease.

Samsara's waiver defense is therefore not a basis for reversing the trial court's order granting Rreef's attachment application.

---

[9] *Kruger v. Reyes* (2014) 232 Cal.App.4th Supp. 10, another case cited by Samsara, is inapposite because it does involve issues of waiver. Rather, the issue before the court was whether the tenants had timely paid rent according to the terms of the parties' lease agreement, and whether the landlord's three-day notice was premature as a matter of law. (*Id.* at pp. 13–14, 20.)

### 3. *Substantial Evidence Supports a Finding that Rreef Was Not Estopped from Asserting Its Unlawful Detainer Claim.*

Samsara argues that Rreef is estopped from proceeding with its unlawful detainer action based on Rreef's opposition to Samsara's *ex parte* application to consolidate the unlawful detainer and environmental actions, where Rreef stated that "Samsara has a clear path to eliminating the Unlawful Detainer Action: it can either pay the unpaid rent, under protest, or it can surrender the Premises and return the keys." According to Samsara, Rreef is judicially and equitably estopped from asserting its unlawful detainer claim because the trial court denied Samsara's *ex parte* application, and Samsara relied on the statement in Rreef's opposition when it paid the rent demanded in the 5-day notice.

### a. Judicial Estoppel

" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 (*Jackson*).) Judicial estoppel is an "equitable doctrine," so its application is "discretionary," even where all elements of the doctrine are met. (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422.) The doctrine must be "applied with caution" and is "limited to egregious circumstances." (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 170.) It is an " ' "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." ' " (*Daar & Newman v. VRL International* (2005) 129 Cal.App.4th 482, 490–491.)

The doctrine applies when: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Jackson, supra*, 60 Cal.App.4th at p. 183.) "A trial court's determination on the issue of estoppel is a factual finding which will be upheld if supported by substantial evidence." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850.)

Rreef argues that Samsara's judicial estoppel defense fails because the third and fourth elements are not satisfied. We agree.

The third element requires that the party to be estopped was successful in asserting the first position. (*Jackson, supra*, 60 Cal.App.4th at p. 183.) "This means not just that the party prevailed in the earlier action, but that 'the tribunal adopted the position or accepted it as true[.]' " (*The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 845.) " 'Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," . . . and thus poses little threat to judicial integrity.' " (*Jogani v. Jogani, supra*, 141 Cal.App.4th at p. 171.) Here, Rreef asserted several arguments in support of its opposition to Samsara's *ex parte* application. The record does not indicate that the trial court, in denying Samsara's *ex parte* application, relied in any way on Rreef's representation in its opposition that Samsara could "eliminat[e]" the unlawful detainer action by paying the unpaid rent under protest. Thus, substantial evidence supports a finding that Samsara did not establish the success element of its judicial estoppel claim.

The cases relied on by Samsara do not compel a different conclusion. In *Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542, the borrowers brought an action seeking to vacate the lender's foreclosure sale of the borrower's property. (*Id.* at p. 545.) The trial court found in favor of the borrowers, and the lender appealed. (*Ibid.*) While the appeal was pending, the borrowers filed a motion for an award of attorneys' fees as the prevailing party, which the trial court granted. (*Ibid.*) The Second District ultimately reversed the judgment, and on remand, the trial court declared the foreclosure sale valid and then granted the lender's motion for attorney's fees. (*Id.* at p. 546.) On the borrower's appeal from the award of attorney's fees, the Second District concluded that the borrowers' prior successful motion for attorneys' fees estopped them from claiming that the lender had no right to the fees. (*Id.* at p. 549.)

Similarly, in *Rissetto v. Plumbers & Steamfitters Local 343* (9th Cir. 1996) 94 F.3d 597, the Ninth Circuit held that the plaintiff was judicially estopped from asserting her employment claims, where she had previously received workers' compensation benefits for temporary total disability. (*Id.* at pp. 605–606.) Her civil claims were premised on the theory that she had been able to perform her job but had been constructively discharged. (*Id.* At pp. 509, 606.) The Ninth Circuit found that theory to be inconsistent with the plaintiff's workers' compensation award, which was based on her assertion that she had an inability to work. (*Id.* At pp. 605–606.)

In contrast, allowing Rreef to proceed with its unlawful detainer action is not necessarily inconsistent with the trial court's denial of Samsara's *ex parte* application to consolidate the parties' actions, as there is no indication in the record that the trial court's decision was based on Rreef's position in its opposition that payment of the unpaid rent would eliminate the unlawful

30

detainer action. (See *Filtzer v. Ernst* (2022) 79 Cal.App. 5th 579, 587 [finding that the success element of the judicial estoppel doctrine was not met because there was no evidence that the trial court relied on the defendant's characterization of the parties' forebearance agreement as "brief" in denying the plaintiff's *ex parte* application for right to attach order].)

Moreover, regarding the fourth element of judicial estoppel, Rreef's positions were not so inconsistent that " ' "one necessarily excludes the other." ' " (*Bell v. Wells Fargo Bank, N.A.* (1998) 62 Cal.App.4th 1382, 1386.) One of Rreef's arguments in its *ex parte* opposition was that Samsara's environmental action was not legal justification for it remaining in possession of the premises without paying rent. It is within this context that Rreef stated that Samsara could eliminate the unlawful detainer action by paying the "unpaid rent" under protest. At that point, only the August and September rent were unpaid. By the time Samsara paid the August and September rent, however, Rreef was claiming that Samsara had failed to pay the rent due in October. Based on this record, the trial court reasonably could have concluded that Rreef's position in its *ex parte* opposition was that Samsara needed to pay *all* rent owed under protest during its environmental action, and therefore Rreef's position in proceeding with its unlawful detainer action after Samsara paid the August and September rent was not "totally inconsistent" with the position it took in its *ex parte* opposition. (*Jackson, supra*, 60 Cal.App.4th at p. 182; see *Bell v. Wells Fargo Bank, supra,* at pp. 1387–1388 [statements that sickness rendered man disabled and unable to perform his work did not estop him from seeking reasonable accommodation for that work].) We therefore turn to Samsara's equitable estoppel claim.

31

### b. Equitable Estoppel

In comparison to judicial estoppel, which focuses on " 'the relationship between the litigant and the judicial system,' and is designed to 'protect the integrity of the judicial process,' " equitable estoppel focuses on the relationship between the parties. (*Jackson, supra*, 60 Cal.App.4th at p. 183.) " 'The doctrine of equitable estoppel is based on the theory that a party who by his declarations or conduct misleads another to his prejudice should be estopped from obtaining the benefits of his misconduct.' " (*Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1567.) " 'A party may invoke equitable estoppel to prevent his opponent from changing positions if (1) he was an adverse party in the prior proceeding; (2) he detrimentally relied upon his opponent's prior position; and (3) he would now be prejudiced if a court permitted his opponent to change positions.' " (*Jackson, supra*, at p. 183.)

Samsara's equitable estoppel claim fails because it has not shown that it relied on Rreef's representation to its detriment. " ' "The doctrine acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine." ' " (*Money Store Investment Corp. v. Southern California Bank* (2002) 98 Cal.App.4th 722, 732.) Samsara argues that after it paid the full amount of rent demanded in the 5-day notice under protest, Rreef reneged on its representation in its *ex parte* opposition that it would dismiss its unlawful detainer action. Samsara concludes from this that Rreef should be estopped from proceeding with its unlawful detainer action. This is not a defensive use of the estoppel doctrine. Samsara does not dispute that it was required under the parties' lease agreement to pay the rent demanded in the 5-day notice or that paying the rent under protest would not affect its claim for

32

damages in the environmental action.  The court reasonably could have concluded that Rreef would not have an unfair advantage over Samsara in either action by accepting Samsara's payment of the rent demanded in the 5-day notice.  We find no detrimental reliance suggested by the record and no basis for the application of an estoppel in this matter.

In sum, Samsara has not demonstrated that the trial court erred in finding that Rreef should not be estopped from proceeding with its unlawful detainer action.

## D. Remand Is Required Because the Trial Court Failed to Consider Samsara's Claims of Improper Purpose and Retaliatory Eviction.

Finally, Samsara argues that certain comments the trial court made at the hearing on Rreef's attachment application shows that the court failed to consider Samsara's retaliatory eviction defense and the issue of whether Rreef was seeking attachment for a proper purpose, a required consideration under section 484.090, subdivision (a)(3).  Rreef argues that we should presume the trial court considered those issues, and even if the court failed to consider those issues, Samsara's retaliatory eviction defense fails as a matter of law.  We conclude that Samsara's retaliatory eviction defense does not fail as a matter of law, and that remand is required for the trial court to consider Samsara's retaliatory eviction defense and the issue whether Rreef sought attachment for a proper purpose.

### 1.  The Trial Court Did Not Make All Requisite Factual Findings.

In its opposition to Rreef's attachment application, Samsara asserted a defense of retaliatory eviction.  This defense is relevant to the issue of the probable validity of Rreef's unlawful detainer claim because "a landlord may be precluded from evicting a tenant in retaliation for certain kinds of lawful activities of the tenant. As a landlord has no right to possession when he

33

seeks it for such an invalid reason, a tenant may raise the defense of retaliatory eviction in an unlawful detainer proceeding." (*S.P. Growers Assn. v. Rodriguez* (1976) 17 Cal.3d 719, 724 (*S.P. Growers*); see *Schweiger v. Superior Court* (1970) 3 Cal.3d 507, 517 ["The foregoing authorities persuade us to recognize in unlawful detainer actions a defense that the eviction is sought in retaliation for the exercise of statutory rights by the tenant"].) Whether or not the landlord's motive was retaliatory ordinarily raises a factual question. (*Ibid.*)

Similarly, in issuing a right to attach order, one of the findings the court must make is that the applicant is not pursuing attachment for "a purpose other than the recovery on the claim upon which the attachment is based." (§ 484.090, subd. (a)(3).) "The court's determinations shall be made upon the basis of the pleadings and other papers in the record[.]" (§ 484.090, subd. (d).)

Samsara argued in the trial court that Rreef filed the unlawful detainer complaint in retaliation for Samsara filing the environmental action based on the timing of the 5-day notice, which Rreef served on Samsara one day after Samsara initiated the environmental action and five months after Samsara first failed to pay rent, and on evidence that Rreef had previously drawn on the letter of credit and could have done so at the time it initiated the unlawful detainer action to cover the unpaid rent, and that Rreef refused to consider Samsara's offers to compromise. Based on some of the same evidence, namely that Rreef could draw on the letter of credit for the full amount it sought to attach, Samsara further argued that Rreef was seeking attachment for an improper purpose.

On appeal, Samsara argues that the trial court committed reversible error because it failed to consider Samsara's retaliatory eviction defense and the

issue of whether Rreef sought attachment for an improper purpose.  We agree.  At the hearing, when Rreef's counsel raised the issue of whether Rreef's unlawful detainer action was retaliatory, the following exchange occurred:

"THE COURT: Excuse me.  [¶]  You really expect me at the stage of the proceedings to determine whether somebody is or is not acting in good faith?

MR. BETZ: Absolutely not, no.

THE COURT: I don't think I can do that.

MR. BETZ: No.  My only point is that when they say it's bad faith, when somebody stays in your property and they don't pay, unlawful detainers follow. . . .  [¶]  That's too late to say that we're retaliating when someone is using the property and doesn't pay. . . .  [¶]. . . .

THE COURT: Counsel, you can't blame the good attorney for using every argument they got."

The trial court also stated, "I'm not going to consider offers of compromise . . . ."  Given this record, we cannot indulge in the presumption that in granting the attachment application, the trial court made all the factual findings necessary to supports it decision, as it was required to consider the relative merits of the parties' respective positions on the probable validity of Rreef's claim.  (Cal. Law Revision Com. com., 15A West's Ann. Code Civ. Proc. (2011 ed.) foll. § 481.190, p. 20; see *Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 336, 341 [finding that the trial court failed to consider the likelihood of the plaintiff's success on the merits in deciding the plaintiff's preliminary injunction application, where the court stated at the hearing, "I don't think it's necessary . . . ."].)  Although the trial court made those comments in response to counsel's discussion of Samsara's retaliatory eviction defense, Samsara had argued in

35

its opposition to Rreef's attachment application that the evidence supporting its improper purpose claim further supported the allegation that Rreef had a retaliatory motive. By refusing to consider Samsara's retaliatory eviction claim and whether Rreef was acting in "good faith," the court was also refusing to consider whether Rreef sought attachment for an improper purpose. Thus, we conclude that the trial court failed to consider the merits of and weigh the evidence relevant to Samsara's claims of retaliatory eviction and improper purpose.[10]

## 2. *Rreef's Contentions Regarding Samsara's Retaliatory Eviction Defense*

Unable to dispute that the trial court failed to make all requisite factual findings, Rreef makes three arguments that Samsara's retaliatory eviction defense fails as a matter of law. All lack merit.

First, Rreef suggests that retaliatory eviction is not available as a defense in commercial unlawful detainer actions. The cases Rreef relies on, however, do not stand for the proposition that a commercial tenant can never assert a retaliatory eviction defense in an unlawful detainer action. The Second District in *Mobil Oil Corp. v. Handley* (1978) 76 Cal.App.3d 956, disagreed with on other grounds by *Esbensen v. Userware International, Inc.* (1992) 11 Cal.App.4th 631, 638, fn.4, stated in dicta that the opinion of *S.P. Growers, supra*, 17 Cal.3d 719 "indicates a possibility" that the retaliatory defense may

_____

[10] The case Rreef relies on in arguing that we should not consider the comments the trial court made at the hearing—*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443—is inapposite. In that case, the appellant had argued that the trial court erred because it failed to make express findings on certain issues, even though the trial court was not required to do so. (*Id.* at pp. 1450–1451.) Thus, the appellate court concluded that the doctrine of implied findings applied because the record was silent on those issues. (*Ibid.*)

be unavailable in a commercial eviction. (*Mobile Oil Corp. v. Handley*, at p. 966.) And the court in *S.P. Growers* did not determine whether a commercial lessee can advance a retaliatory eviction defense. It merely distinguished the case before it, a residential eviction case, from *Union Oil Co. v. Chandler* (1970) 4 Cal.App.3d 716 (*S.P. Growers*, at pp. 729–730), a commercial eviction case where the lessee contended that the landlord was evicting him for not acceding to a price-fixing scheme which violated federal and state antitrust laws. (*Union Oil Co. v. Chandler*, at p. 725.) The *Union Oil* court concluded that the lessee should litigate its antitrust claims in a separate action. (*Id.* at 726.)

More than a decade after *S.P. Growers* was decided, our colleagues in Division Three of this court decided *Custom Parking, Inc. v. Superior Court* (1982) 138 Cal.App.3d 90 (*Custom Parking*). *Custom Parking* involved a commercial tenant who asserted a claim in the landlord's unlawful detainer action that the landlord had terminated the tenant's tenancy because the tenant's officers and employees refused to perjure themselves in an action involving the landlord and its other tenants. (*Id.* at pp. 91–92, 100–101.) The trial court rejected the tenant's retaliatory eviction defense and entered judgment in favor of the landlord. (*Id.* at p. 93.) On appeal from the judgment, this court first recognized the general rule from *S.P. Growers, supra*, 17 Cal.3d at pp. 728–729 that " '[a] valid defense of retaliatory eviction may be advanced if, on balance, the public policies furthered by protecting a tenant from eviction outweigh the state's interest in ensuring that unlawful detainer proceedings are truly summary.' " (*Custom Parking*, at p. 94.) It noted, however, that the application of that rule in the case before it was complicated by case law that recognized a distinction between commercial and residential unlawful detainer actions. (*Id.* at p. 96.)

In particular, the court considered *Schulman v. Vera* (1980) 108 Cal.App.3d 552 (*Custom Parking, supra*, 138 Cal.App.3d at pp. 97–100), where the trial court had excluded evidence in an unlawful detainer action that the landlord had breached a covenant to repair the roof of a building used by the tenant for its restaurant (*Schulman v. Vera*, at p. 555). The Fourth District upheld the trial court, finding that a commercial lessee is generally prohibited from asserting damages resulting from a "breach of the lessor['s] covenant to repair . . . as a defense . . . to an unlawful detainer action by the lessor based on the lessee's nonpayment of rent." (*Id.* at p. 560.) It reasoned that such a claim would destroy the summary nature of the unlawful detainer proceeding by injecting into the action several additional issues, including whether or not the lessees properly notified the lessors of the need for repairs, whether the repairs were needed, and the nature and extent of the damages resulting from the failure to repair. (*Id.* at p. 563.) Although the Supreme Court previously held in *Green v. Superior Court* (1974) 10 Cal.3d 616 that a lessee could assert the lessor's breach of the covenant to repair as a defense in an unlawful detainer action, the *Schulman v. Vera* court found that the holding was limited to residential leases, as the *Green* court had remarked on "the unavailability to the average urban apartment dweller of financing for major repairs, and the unequal bargaining power of landlord and tenant resulting from the scarcity of adequate housing in urban areas." (*Schulman v. Vera, supra,* at pp. 560–561.)

Turning to the case before it, the *Custom Parking* court found that although *Schulman v. Vera, supra*, 108 Cal.App.3d 552 "reveals that there is some validity to the commercial/residential distinction[,]" the "crucial issue" was "whether that distinction should apply where the defense is not breach of a covenant to repair, but retaliation for the tenant's exercise of his duty to

38

testify truthfully." (*Custom Parking, supra*, 138 Cal.App.3d at pp. 100–101.) The court concluded that "there is a strong public policy against intimidating witnesses in a lawsuit from testifying honestly[,]" and thus "the distinction between a commercial and a residential tenancy pales into insignificance." (*Id.* at p. 101.) Because the retaliatory eviction defense "raise[d] only the issue of whether the landlord, in attempting to evict, acted by reason of an improper motive[,]" the court found that the balance tipped in favor of permitting the defense, and it issued a peremptory writ of mandate directing the trial court to vacate its judgment. (*Ibid.*) Thus, commercial lessees are not categorically precluded from asserting a retaliatory eviction defense; rather, whether a commercial lessee can advance such a defense may depend on the balancing test set forth in *S.P. Growers, supra*, 17 Cal.3d at pp. 728–729.

Apparently recognizing this rule, Rreef next argues that Samsara should be precluded from advancing its retaliatory eviction defense because its "unfounded accusations of a retaliatory motive are not sufficient to overcome the state's interest in affording landlords a summary unlawful detainer procedure." Rreef does not explain why the state's interest in summary proceedings outweighs the public policies furthered by Samsara's assertion of its rights in the environmental action. Moreover, Rreef did not argue in the trial court that Samsara could not advance its retaliatory eviction defense. Nevertheless, we have discretion to consider a new issue on appeal when it is purely a matter of applying law to undisputed facts. (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316.)

We first observe that this is not a case like *Schulman v. Vera, supra*, 108 Cal.App.3d 552 where the commercial lessee is attempting to inject into the unlawful detainer action a claim for damages. Rather, Samsara is claiming

that Rreef cannot evict it for litigating its rights in the environmental action, and Samsara's assertion of its rights in that action supports the legitimacy of its retaliatory eviction defense. In particular, Samsara's environmental complaint asserts a claim for violation of Health & Safety Code section 25359.7, subdivision (a). That statute provides remedies to potential lessees where an owner of nonresidential property fails to disclose to the lessees the presence of hazardous substances on the premises, and it represents a legislative judgment that such disclosures furthers public safety or health. (Health & Saf. Code, § 25359.7, subd. (a).) To preclude a defense of retaliatory eviction in this case would provide commercial landlords "with a legally sanctioned means of punishing tenants" for litigating their statutory rights, thereby deterring enforcement of that statute. (*Custom Parking, supra*, 138 Cal.App.3d at p. 101; see *S.P. Growers, supra*, 17 Cal.3d at p. 728 ["In a retaliatory eviction proceeding, the crucial question is not whether the statute is designed to aid tenants, but whether it depends for its effectiveness on private initiative and would thus be emasculated by allowing punitive eviction"].)

Moreover, as in *Custom Parking*, Samsara's retaliatory eviction defense raises only the question of whether Rreef acted with an improper motive in attempting to evict Samsara. We therefore cannot conclude that the state's interest in summary proceedings outweighs the public policies furthered by Samsara's assertion of its rights in the environmental action. Because Rreef has not shown that the balance tips in favor of precluding Samsara's retaliatory eviction defense (*S.P. Growers, supra*, 17 Cal.3d at pp. 728-729), Samsara may raise the defense, although we make no findings regarding the merits of that defense.

40

Finally, citing Civil Code section 1942.5, Rreef argues that nonpayment of rent automatically disqualifies a retaliatory eviction defense. That section provides that "[i]f the lessor retaliates against the lessee because of the exercise by the lessee of the lessee's rights . . . or because of the lessee's complaint to an appropriate agency as to tenantability of a dwelling, and if the lessee of a dwelling is not in default as to the payment of rent, the lessor may not recover possession of a dwelling in any action or proceeding . . . ." (Civ. Code, § 1942.5, subd. (a).) Rreef acknowledges that the statute only applies to residential tenancies, but it contends that the policy embodied by Civil Code section 1942.5, subdivision (a), should apply with equal force in the commercial context. However, even as applied to residential tenancies, section 1942.5 does not displace the common law retaliatory eviction defense, as it expressly provides that its remedies "shall be *in addition to* any other remedies provided by statutory or decisional law." (Civ. Code, § 1942.5, subd. (j), italics added; see *Barela v. Superior Court* (1981) 30 Cal.3d 244, 251 ["California has two parallel and independent sources for the doctrine of retaliatory eviction"].)

Rreef's remaining contentions are based on the sufficiency of the evidence. Because the record shows that the trial court did not consider or weigh the evidence relevant to Samsara's claims of retaliatory eviction and improper purpose, we will not usurp the function of the trial court by ruling on the merits of those claims in the first instance. (*Right Site Coalition v. Los Angeles Unified School Dist., supra*, 160 Cal.App.4th at p. 345.) We therefore reverse and remand with directions to the trial court to determine whether Samsara's retaliatory eviction defense more likely than not bars Rreef's unlawful detainer claim and whether Rreef sought attachment for an improper purpose.

41

### III.   DISPOSITION

The attachment order is reversed.  The matter is remanded to the trial court to determine whether Samsara's retaliatory eviction defense more likely than not bars Rreef's unlawful detainer action and whether Rreef sought attachment for an improper purpose.  The parties are to bear their own costs on appeal.

SWOPE, J.*

WE CONCUR:

HUMES, P. J.

MARGULIES, J.

A163827P

---

* Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43

Superior Court of San Francisco

Honorable Charles F. Haines

Counsel:

Quinn Emanuel Urquhart & Sullivan, Bruce E. Van Dalsem, Daniel C. Posner, William T. Pilon for Defendants and Appellants.

Allen Matkins Leck Gamble Mallory & Natsis, Michael J. Betz, Timothy B. McGinity, Kent W. Toland for Plaintiffs and Respondents.